# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# GREENVILLE DIVISION

**KEVIN RUSSELL (# K3887)**                                                                      **PLAINTIFF**

**v.**                             **No. 4:04CV144-P-A**

**DR. JOHN BEARRY, ET AL.**                                                    **DEFENDANTS**

## MEMORANDUM OPINION

This matter comes before the court on the *pro se* prisoner complaint of Kevin Russell, who challenges the conditions of his confinement under 42 U.S.C. § 1983. For the purposes of the Prison Litigation Reform Act, the court notes that the plaintiff was incarcerated when he filed this suit. For the reasons set forth below, the instant case shall be dismissed for failure to state a claim upon which relief could be granted.

### Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066 (1988)). After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d

202 (1986); *Beck*, 204 F.3d at 633; *Allen v. Rapides Parish School Bd.*, 204 F.3d 619, 621 (5th Cir. 2000); *Ragas v. Tennessee Gas Pipeline Company*, 136 F.3d 455, 458 (5th Cir. 1998). Substantive law determines what is material. *Anderson*, 477 U.S. at 249. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*, at 248. If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex*, 477 U.S. at 327. "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538 (1986); *Federal Savings and Loan, Inc. v. Krajl*, 968 F.2d 500, 503 (5th Cir. 1992). The facts are reviewed drawing all reasonable inferences in favor of the non-moving party. *Allen*, 204 F.3d at 621; *PYCA Industries, Inc. v. Harrison County Waste Water Management Dist.*, 177 F.3d 351, 161 (5th Cir. 1999); *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995). However, this is so only when there is "an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *see Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998). In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075 (emphasis omitted).

**Undisputed Material Facts**[1]

The Mississippi Department of Corrections (MDOC) took custody of Plaintiff

---

[1] The facts are taken nearly verbatim from the defendants' memorandum of authorities in support of the defense motion for summary judgment. The plaintiff has not disputed these facts, which are supported by references to the plaintiff's extensive medical records.

Russell in September, 2000, after he received a life sentence for rape and for kidnapping an adult to sexually assault. (Ex. 3). Plaintiff Russell is at the Mississippi State Penitentiary (MSP) at Parchman, Mississippi. (Ex. 3). During Russell's intake physical in September, 2000, Russell gave a medical history of prior injury to his left elbow, right wrist, right side of his neck and upper right thigh from a 1986 gunshot wound. (Ex. 2 at ¶ 8).

### Russell's Injury and Initial Treatment

On October 8, 2001, Russell told Certified Family Nurse Practitioner (CFNP) Phelon that he injured his elbow when he was assaulted by another inmate. Russell's elbow was swollen and he could not extend his arm. CFNP Phelon ordered Ibuprofen for pain and ordered an x-ray of the elbow. (Ex. 2 at ¶9). Two x-ray views were taken on October 9, 2001, and on that same date Dr. Juan Santos reviewed the x-rays and examined Russell. (Ex.2 at ¶¶ 11,12) The x-ray report by Dr. Pollard stated:

> Multiple metallic fragments are present superimposed over the elbow. There is displacement of both the interior and posterior fat stripes (fat between ligaments and tendons). Degenerative (gradual deterioration with corresponding loss of function) changes are noted in the medial (middle) compartment of the elbow. On the underexposed AP projection, there is subtle suggestion of break in the cortex (outer part) lateral (side) aspect distal (far from point of attachment) humerus. This may be fortuitous and suggest additional views of the elbow.
>
> Imp: Previous gunshot wound. Distended (swollen) joint capsule, which may represent joint effusion (abnormal collection of fluid) secondary to degenerative changes or occult (hidden) fracture. Recommend additional views for possible fracture.

(Ex.2 at ¶ 11) (parenthetical explanations added).

Dr. Santos found no gross fractures and told Russell to continue to take Ibuprofen. (Ex.2 at ¶ 12).

CFNP Phelon on October 22, 2001, prescribed Anaprox, a medication for pain and inflammation, and recommended that an orthopaedic consultation be schedule for Russell's elbow. (Ex.2 at ¶ 13). On November 1, 2001, Dr. Bearry read the x-rays taken on October 9, 2001, and ordered additional x-rays and Dr. Pollard's interpretation of those x-rays stated:

> Two views obtained demonstrating bony fragments overlying the elbow seen as multiple metallic densities. There is deformity radial head. A comminuted (fragmented) fracture distal humerus (upper arm bone) extending into the metaphysis and I suspect into the joint is noted. There is displacement of the posterior fat stripe. The anterior fat stripe is poorly visualized.
>
> Impression:
> 1. Fractures of the distal humerus (upper arm bone) extending which is comminuted and diastatic (separated)
> 2. Fracture of the distal radius (one of the forearm bones), age indeterminate
> 3. Previous gun shot wound.

(Ex.2 at ¶ 14)(parenthetical explanations added).

Dr. Bearry stopped the Anaprox prescription, prescribed Indocin for pain and ordered an orthopaedic consultation for Russell's elbow. (Ex.2 at ¶ 14).

### Treatment by UMC Orthopaedic Physicians

Between November, 2001, and June, 2003, four different orthopaedic physicians saw Russell on eight different dates at the University of Mississippi Medical Center in

Jackson, Mississippi. (Ex.2 at ¶¶ 15, 17, 19, 21, 22, 23, 24, 30).

On November 27, 2001, Dr. Todd Smith examined Russell. Russell told Dr. Smith that the broken bones in his left elbow from the 1986 gunshot wound were treated by a surgical procedure called open reduction internal fixation, where the broken bones are fixed in place by the use of screws or plates. Russell's elbow was x-rayed and Dr. Smith found a possible fracture above the elbow joint in the upper humerus[2] and applied a long arm cast to Russell's left arm. (Ex.2 at ¶ 15).

On December 18, 2001, Russell's elbow was x-rayed at UMC and Dr. Morgan removed the cast, recommended physical therapy and told Russell to return in six weeks. (Ex.2 at ¶ 17).

Russell returned to UMC six weeks later and saw Dr. Todd Smith on January 29, 2002. The x-rays taken at UMC showed the fracture was healing. Dr. Smith discussed with Russell one procedure to shorten the muscles and tendons adjacent to the elbow, a contracture release, and another procedure to surgically realign the joint and Dr. Smith recommended that Russell continue with his physical therapy. (Ex.2 at ¶ 19).

Dr. Todd Smith on May 14, 2002, noted Russell's fracture was closed and he found that Russell had some loss of motion in the joint from trauma due to excessive fibrotic response in the repair process. Dr. Smith told Russell to avoid heavy labor and prolonged use of his left elbow until a decision was made on surgery. (Ex.2 at ¶ 21).

---

[2]The humerus is the bone above the elbow joint and the two forearm bones below the elbow joint are the radius and the ulna. (Ex. 2 at ¶10).

On July 25, 2002, Dr. Buford Yerger saw Russell at the UMC orthopaedic clinic. Russell had improved mobility in his elbow and Dr. Yerger told Russell that in the future he might need total elbow arthroplasty or TEA, which is the surgical restoration or replacement of a degenerated elbow joint. (Ex.2 at ¶ 22).

On October 23, 2002, Russell told Dr. Yerger he wanted the TEA but Dr. Yerger told Russell he would recommend the procedure as only a last resort. X-rays were taken and the report stated:

> Findings: Metallic foreign bodies are present projecting over the distal humerus and proximal radius and ulna. No acute fracture lines are visualized. There is deformity of the distal humerus and proximal radius suggestive of old trauma or old healed fracture. No soft tissue abnormalities are seen. No joint effusion is visualized.

(Ex.2 at ¶ 23).

Dr. Yerger saw Russell on December 3, 2002, and again told Russell a TEA was not needed. Dr. Yerger did tell Russell his elbow might benefit from open debridement and he told him to return in 6 months. The report for the x-rays taken on that visit states:

> Findings: Metallic fragments are again seen within the joint space of the left elbow. No acute fracture or dislocation is identified.
>
> Imp: No acute change from previous study.

(Ex.2 at ¶ 24).

Six months later, Russell saw Dr. William McCraney at UMC on June 23, 2003. Dr. McCraney reviewed the x-rays taken that date and examined Russell. Dr. McCraney found Russell had degenerative joint disease in his left elbow and prescribed Naprosyn

for pain and recommended physical therapy and told Russell to return in a month. Russell told Dr. McCraney he wanted the TEA and Dr. McCraney discussed the risks of TEA at Russell's age and said he would discuss TEA with Dr. Geissler. (Ex.2 at ¶ 30).

### Treatment at MSP During Treatment By UMC Physicians

During the 31 month period that he was being seen by the orthopaedic physicians at UMC, Russell's elbow was also being treated by the medical providers at MSP.

After Russell returned from his November, 2001, visit with Dr. Todd Smith, Dr. Santos examined Russell on December 14, 2001, and had his elbow x-rayed. (Ex.2 at ¶ 16).

After Russell's second exam at UMC by Dr. Morgan in December, 2001, Dr. Bearry on January 22, 2002, had Russell's elbow x-rayed. (Ex.2 at ¶ 18).

After Russell's third exam in January, 2002, at UMC by Dr. Todd Smith, Dr. Santos examined Russell on March 18, 2002, and prescribed Indocin and told Russell to continue his physical therapy. (Ex.2 at ¶ 20).

After Russell's seventh exam by Dr. Yerger in December, 2002, Dr. Kim examined Russell at MSP on December 31, 2002. (Ex.2 at ¶ 25).

On February 24, 2003, Russell told Dr. Touchstone at MSP that he re-injured his elbow on February 5, 2003. The x-rays ordered by Dr. Touchstone showed:

> multiple bony fragments overlying the elbow. Degenerative changes are noted at the elbow joint. I suspect previous fractures. No distinct acute changes are identified.

Dr. Santos examined Russell and the x-rays and prescribed Ibuprofen on February 26, 2004. (Ex.2 at ¶ 26).

After Dr. McCraney examined Russell on June 23, 2002, Dr. Santos saw Russell on that same day and prescribed Naprosyn as recommended by Dr. McCraney. (Ex.2 at ¶ 30).

## Treatment After UMC Consultations

After the last UMC orthopaedic consultation in June, 2003, Russell continued to be seen by MSP medical providers.

Russell resumed physical therapy in July, 2003. (Ex.2 at ¶ 31). In September and October, 2003, Dr. Bearry refused a request from Dr. Cabe and Dr. Touchstone to refer Russell to an orthopaedic physician because both requests were for the 1986 gunshot wound injury which Dr. Bearry found was a longstanding pre-existing musculoskeletal injury. (Ex.2 at ¶¶ 32-35).

In November, 2003, Dr. Cabe continued Russell's physical therapy. (Ex.2 at ¶ 36).

In December, 2003, Russell was examined by Dr. Cabe and Dr. Touchstone. Dr Cabe's exam found nothing remarkable about Russell's elbow, but on December 19, Dr. Touchstone found his elbow had decreased motion and affected his activities for daily living so he requested an orthopaedic consult. (Ex.2 at ¶¶ 37,38). Dr. Bearry denied Dr. Touchstone's request because it was for an old pre-existing injury. (Ex.2 at ¶ 39).

During Dr. Kim's exam on January 14, 2004, Russell complained of pain and numbness in his left arm (Ex.2 at ¶ 41), and on January 29, 2004, CFPN Pettis ordered x-rays which showed:

> Numerous soft tissue and bony metallic densities consistent with retained foreign body. There is osteoarthritis [most common form of arthritis caused by chronic breakdown of cartilage in the joints] involving all articulations. No acute fracture or dislocation appreciated.

Ex.2 at ¶ 42).

Dr. Santos examined Russell's elbow in February and March, 2004, and found some decreased movement but no gross swelling and scheduled Russell to see Dr. Bearry. (Ex.2 at ¶ 45). Dr. Bearry examined Russell on March 5, 2004, and noted that the 1986 gunshot injury resulted in a slight decrease in function and that in October, 2001 the elbow was fractured when the inmate assaulted Russell. Dr. Bearry stated the healing of the fracture was not optimal and he found some weakness in Russell's left hand grip but no gross atrophy of the left arm. Dr. Bearry decided to refer Russell for an orthopaedic consultation. (Ex.2 at ¶ 46). Dr. Touchstone prepared the request with a diagnosis of degenerative joint disease from an old injury and Dr. Bearry added that Russell had a decreased range of motion and pain which affected Russell's activity for daily living. (Ex.2 at ¶ 47).

Dr. Ivans, who was at that time the Regional Medical Director, on March 12, 2004, deferred the request because Russell's elbow was in a chronic stable condition. Dr. Ivans recommended Russell be prescribed exercises to increase his range of motion and Dr.

Bearry accepted that recommendation. (Ex.2 at ¶ 48).

In April and May, 2004, Russell asked to see Dr. Ivans. (Ex.2 at ¶¶ 52,53,54). Russell was told that Dr. Ivans had deferred the request for an orthopaedic consultation. (Ex.2 at ¶ 55).

Russell asked to see Dr. Ivans in June and July, 2004, (Ex.2 at ¶¶ 56, 57,58), and on July 30, 2004, Dr. Bearry told Russell he would be placed on Dr. Ivans' schedule. (Ex.2 at ¶ 59). However, in August, 2004, Russell was hospitalized for chemical burns to his face, neck, both arms and abdomen. (Ex.2 at ¶ 60). In October, 2004, Russell was stabbed in his left wrist by another inmate and while treating the stab wound, Dr. Bearry told Russell he would schedule Russell to see Dr. Ivans. (Ex.2 at ¶¶ 64,65). Dr. Ivans left his position and a new consult request was submitted and was approved for Russell to see Dr. Wright when clinic space became available. (Ex.2 at ¶¶ 67,68,69).

On April 26, 2005, Russell refused to obey security officers and his elbow was injured when the officers attempted to enforce the order. (Ex.2 at ¶ 70). Another referral request was prepared in May, 2005 and submitted to CMS for approval. (Ex.2 at ¶¶ 71,72). In September, 2005, Dr. Santos told Russell he would check on the appointment for his elbow. (Ex.2 at ¶ 74).

Russell asked Dr. Bearry in December, 2005, for a referral for a TEA and Dr. Bearry agreed to discuss Russell's elbow with Dr. Ramsue and ordered resumption of physical therapy for Russell for one month. (Ex.2 at ¶ 77).

Beginning in January, 2006, Russell experienced heart-related symptoms and stomach-related problems and the treatment provided to Russell during January through July, 2006 included medications, hospitalizations and cardiac consultations. Russell's complaints after January, 2006, have been primarily about chest pains, high blood pressure and stomach problems and only occasionally about his left elbow. (Ex.2 at ¶¶ 79-84 and at medical records KR00368-00551).

**Denial of Medical Treatment**

In order to prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must allege facts which demonstrate "deliberate indifference to the serious medical needs of prisoners [which] constitutes 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment . . . whether the indifference is manifested by prison doctors or prison guards in intentionally denying or delaying access to medical care . . . ." *Estelle v. Gamble*, 429 U.S. 97, 104-105, 50 L. Ed. 2d 251, 260 (1976); *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992). The test for establishing deliberate indifference is one of "subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Under this standard, a state actor may not be held liable under 42 U.S.C. § 1983 unless plaintiff alleges facts which, if true, would establish that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 838. Only in exceptional circumstances may knowledge of substantial risk of serious harm be inferred by a court from the obviousness of the substantial risk. *Id*. Negligent conduct by prison officials does

not rise to the level of a constitutional violation. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662 (1986), *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668 (1986). In cases such as the one at bar, arising from delayed medical attention rather than a clear denial of medical attention, a plaintiff must demonstrate that he suffered substantial harm resulting from the delay in order to state a claim for a civil rights violation. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993); *Campbell v. McMillin*, 83 F. Supp. 2d 761 (S.D. Miss. 2000). A prisoner's mere disagreement with medical treatment provided by prison officials does not state a claim against the prison for violation of the Eighth Amendment by deliberate indifference to his serious medical needs. *Gibbs v. Grimmette*, 254 F.3d 545 (5th Cir.2001), *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997).

## Discussion

Based upon the extensive documentation in the plaintiff's prison medical file, the defendants argue that the plaintiff cannot meet his burden of proof in this case. To prevail on his Eighth Amendment claims that defendants CMS and Dr. Ivans denied him medical treatment, the plaintiff must show: (1) that he had a serious medical need, (2) that the defendants knew about that need, and (3) that the defendants, despite that knowledge, refused to meet that need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The plaintiff cannot prove those elements in this case because he has been treated for his elbow injury each time he has requested it. Without question, the plaintiff's elbow has been treated by general practitioners and specialists many times. The plaintiff argues in his response to the motion for summary judgment that he was denied medical treatment during approximately fifty days between the time he was assaulted (October 8, 2001) and the time he first visited the UMC Orthopaedic Clinic. This argument is without merit, as

discussed in the brief chronology set forth below.[3]

- The plaintiff was examined and his elbow x-rayed on October 8, 2001, the date of the injury, and on October 9, 2001. (Ex. 2 at ¶¶ 9,11,12).

- Fourteen days after the injury, on October 22, 2001, Russell was examined again, prescribed medication and recommended for an orthopaedic consultation. (Ex.2 at ¶ 13).

- Twenty-three days after the injury, on November 1, 2001, Dr. Bearry read the x-rays taken on October 9, 2001, ordered additional x-rays and ordered an orthopaedic consultation for Russell's elbow. (Ex.2 at ¶ 14).

- Forty-nine days after the injury, on November 27, 2001, Russell was examined by Dr. Todd Smith at the UMC Orthopaedic Clinic. (Ex.2 at ¶ 15).

The plaintiff has not shown that he suffered substantial harm – or any harm, for that matter – from these alleged delays in treatment. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). (delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm). The medical staff attending the plaintiff provided him with painkillers, anti-inflammatories, or both during each of the plaintiff's examinations. When examination by a general practitioner revealed that the plaintiff's elbow injury warranted examination and treatment by an orthopaedic specialist, the plaintiff was referred to such a specialist. Indeed, the plaintiff was examined by at least four such specialists at the UMC Orthopaedic Clinic.

The plaintiff argues that on June 23, 2003, one of those orthopaedic specialists, Dr. William McCraney, ordered that the plaintiff return in thirty days for either elbow replacement surgery or for contracture release surgery. Dr. Lehman's interpretation of Dr. McCraney's notes

---

[3]The citations refer to the exhibits attached to the defendants' motion for summary judgment; Exhibit 2 is the Affidavit of Dr. Lehman, to which the defendants attached the plaintiff's medical records from September 2002 to July 2006.

that day do not, however, support the plaintiff's memories of what transpired that day. On June 23, 2003, Dr. William McCraney at UMC's orthopaedic clinic examined the plaintiff and had his elbow x-rayed. Dr. William Flowers interpreted the x-rays:

> 30. On June 23, 2003, Dr. William McCraney at UMC's orthopaedic clinic examined Mr. Russell and had his elbow x-rayed. Dr. William Flowers interpreted the x-rays:
>> Comparison made to previous study of 12/3/02. Extensive arthritic change is again seen with multiple metallic fragments and deformity consistent with prior gunshot wound and healing fracture. There has been no acute change in the appearance of the elbow when compared to previous study. (KR 00112)
>
> Mr. Russell told Dr. McCraney he had daily pain and that he wanted a TEA. Dr. McCraney found Mr. Russell's left arm had 60-110 degrees of range of motion and he had full pronation and supination and he noted crepitus (grating, crackling or popping sounds ). Dr. McCraney found the x-rays revealed severe degenerative joint disease and his impression was left elbow degenerative joint disease. Dr. McCraney discussed with Mr. Russell the risk of TEA at his age and noted that Mr. Russell wanted to proceed. Dr. McCraney noted he would discuss a TEA with Dr. Geissler and Dr. McCraney recommended physical therapy and prescribed Naprosyn 250 mg. three times a day and recommended that Mr. Russell return in one month. (KR 00109-00110). Dr. Santos saw Mr. Russell on June 23, 2003, upon his return from seeing Dr. McCraney and prescribed Naprosyn 250 mg. (KR 00107).

(Ex. 2 at ¶ 30).

Dr. McCraney ordered physical therapy and prescribed Naprosyn – not surgery – to treat the elbow injury. The plaintiff received both upon his return to Parchman. (Ex.2 at ¶¶ 30, 31). The plaintiff disagrees with the treatment he has received and argues that he needs surgery to treat his injured elbow. Dr. McCraney wished to discuss the possibility of elbow replacement surgery with a colleague (and probably discussed that possibility with the plaintiff), but no physician has prescribed surgery to treat the plaintiff's injury. As such, his claims shall be

-14-

dismissed.

The plaintiff's medical records reveal that he was examined on numerous occasions, x-rayed, prescribed medications and physical therapy, and referred for many orthopaedic examinations. The medical record for the plaintiff during the time in question consists of 558 pages – hardly indicative of lack of treatment. This evidence does not give rise to a claim of deliberate indifference; instead, it shows that medical personnel treated the plaintiff when he requested treatment. The plaintiff disagrees with the treatment and contends that he should have his left elbow replaced. Mere disagreement with the medical treatment provided does not constitute deliberate indifference. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). Therefore, the motion by the defendants for summary judgment shall be granted, and the plaintiff's Eighth Amendment claims against Dr. Ivans and CMS shall be dismissed. A final judgment consistent with this memorandum opinion shall issue today.

**SO ORDERED,** this the 6th day of March, 2007.

/s/ W. Allen Pepper, Jr.
W. ALLEN PEPPER, JR.
UNITED STATES DISTRICT JUDGE